2007 ME 20

**STATE of Maine**

v.

**Brandon THONGSAVANH.**

Supreme Judicial Court of Maine.

Argued: Sept. 20, 2006.

Decided: Jan. 30, 2007.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. Gen. (orally), Lisa P. Marchese, Asst. Atty. Gen., Lara M. Nomani, Asst. Atty. Gen., Augusta, for State.

Scott J. Lynch, Esq. (orally), David J. Van Dyke, Esq., Hornblower Lynch Rabasco & Van Dyke, P.A., Lewiston, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, and SILVER, JJ.

SAUFLEY, C.J.

[¶ 1] Maine juries have twice convicted Brandon Thongsavanh of murder, 17–A M.R.S.A. § 201 (1983 & Supp.2002),[1] for causing the death of Morgan McDuffee. We vacated the first conviction because the State was allowed to introduce unfairly prejudicial evidence at trial. *See State v. Thongsavanh,* 2004 ME 126, 861 A.2d 39. The second conviction, entered in the Superior Court (Cumberland County, *Gorman, J.*), is now before us. Thongsavanh argues that the court erred in failing to interpret the depraved indifference murder statute to require that the court give a jury instruction on criminally negligent manslaughter, 17–A M.R.S.A. § 203(1)(A) (Supp.2002),[2] and in declining to instruct on manslaughter as a lesser-included offense. He also asserts that the depraved indifference murder statute, 17–A M.R.S.A. § 201(1)(B) (1983), is unconstitutionally vague as applied in his case. Thongsavanh also appeals from his sentence of fifty-eight years of imprisonment, arguing that the sentence is excessive.

[¶ 2] We unanimously conclude that a criminally negligent manslaughter instruction is not required by statute every time the State charges depraved indifference murder, that the depraved indifference murder statute is not unconstitutionally vague as applied, and that the court did not misapply principle or abuse its discretion in imposing the sentence. We are evenly divided on the question of whether the trial evidence generated a jury instruction on manslaughter as a lesser-included offense. Accordingly, we affirm the judgment of conviction and the sentence.

## I. BACKGROUND

[¶ 3] The following facts, taken from the record of the second trial, are relevant to the issues raised on this appeal.

[¶ 4] On the night of March 2, 2002, Thongsavanh left his Lewiston apartment in the vehicle of a friend, Nick Barajas, sometime between 7:30 and 8:00 P.M. They picked up Nate Tao and one other man. The men attended a party at the apartment of Melissa Ramos. Throughout the party, Tao, Barajas, and Thongsavanh went out to Barajas's vehicle to get beer. At some point, Thongsavanh started playing with a folding knife that had been in Barajas's vehicle.

[¶ 5] Barajas, Thongsavanh, and Tao next went to their acquaintance Justin Asselin's apartment. They arrived at around 2:00 A.M., and they continued to drink. After about a half-hour, an acquaintance named Chad Aube came in to say there was a party (or a fight, according to some testimony) underway. The men left Asselin's apartment. Barajas drove by a fight that was underway on Main Street in Lewiston. He stopped his vehicle and he, Thongsavanh, and Tao all got out and entered the fray.

[¶ 6] Here, the stories diverge. According to Tao, Aube was fighting with McDuffee when Thongsavanh arrived. Thongsavanh pulled McDuffee off Aube and McDuffee punched Thongsavanh in the face. Thongsavanh then put his arms out with Barajas's knife in his hand and stabbed McDuffee in the back and chest several times.

[¶ 7] Aube testified that he was exchanging blows with McDuffee. He had just punched McDuffee in the face when

---

1. This statute was amended, effective after the date the crime was committed. P.L.2001, ch. 383, § 8 (effective Jan. 31, 2003) (codified at 17–A M.R.S. § 201 (2006)).

2. This statute was amended, effective after the date the crime was committed. P.L.2001, ch. 383, § 9 (effective Jan. 31, 2003) (codified at 17–A M.R.S. § 203(1)(A) (2006)).

Thongsavanh intervened and began fighting with McDuffee. Aube did not see a knife and thought Thongsavanh was punching McDuffee. Aube saw Thongsavanh pick McDuffee up from underneath and punch him twice in the abdomen.

[¶ 8] Another witness, Mike Levesque, testified that he saw Aube fighting with McDuffee when Thongsavanh arrived. According to Levesque, someone punched Thongsavanh in the face and Levesque began to fight that person. Meanwhile, Levesque saw Thongsavanh begin fighting with someone else, but he could not identify the man as being the same person Aube had initially been fighting. Levesque saw Thongsavanh punch the man in the back and possibly wrap himself around the man.

[¶ 9] According to Thongsavanh's testimony, Aube had just struck a man when Thongsavanh arrived, and Thongsavanh caught the man as he fell. Thongsavanh punched the man in the face, after which an unknown individual hit him in the head and he saw stars. He dropped the man he was holding and put his hands up to his face. Aube and Levesque then cornered the person who had hit Thongsavanh. According to Thongsavanh, the events happened quickly and ended when someone screamed that the police were coming. He testified that he did not stab McDuffee and that he did not know who did.

[¶ 10] A woman who had been walking with McDuffee testified that she did not see what happened to him. On cross-examination, however, it was disclosed that she had previously testified that she had spoken with a Bates College security officer and may have identified an individual in a gray hooded sweatshirt. The Bates officer testified at trial that one or more of the Bates students had described a man in a gray hooded sweatshirt as being the person who had "slashed" McDuffee. However, the officer could not identify which student had made that comment, and he "ha[d] no idea" whether whichever student reported the information had personally seen the sweatshirt.[3]

[¶ 11] After McDuffee's fiancée yelled that she had called the police, the crowd dispersed. McDuffee was taken to a hospital by ambulance but did not survive. He had suffered five stab wounds, one of which, independently, would have been fatal because it had nicked his lung and entered his heart. That wound was five to six inches deep. Although it could not be determined if the wounds had been inflicted by one knife, if there had been only one knife, the blade likely would have measured five to six inches in length.

[¶ 12] After the stabbing, many of the people who had attended Justin Asselin's party returned to his apartment. Barajas, Tao, and Thongsavanh returned soon after Aube. During the ride to Justin Asselin's, Tao rode in the back seat, with Barajas driving and Thongsavanh in the front seat. Tao saw Thongsavanh wipe something on his pants, though he could not see what. According to Tao, Tao said, "You killed that kid," and Thongsavanh said nothing.

[¶ 13] When Thongsavanh arrived at Justin Asselin's apartment, he immediately went into the bathroom, accompanied by a friend named Jamie Asselin[4] who was already at the apartment and had not been present at the fight. Thongsavanh was in the bathroom for fifteen minutes to a half-hour. For some period of time, the water was running in the bathroom. During part of the time, Levesque was also in the bathroom. According to Levesque's testi-

---

**3.** Thongsavanh testified that, after the incident, he saw Chad Aube in a gray hooded sweatshirt.

**4.** Justin and Jaime Asselin are not related.

mony, he asked Thongsavanh about the stabbing, and Thongsavanh said he had better not go down for it.

[¶ 14] Thongsavanh testified that the water was on when he entered the bathroom and that when Jamie Asselin repeatedly asked him what had happened, he said he did not know. According to Thongsavanh, Levesque came in and was drunk, pacing, and mumbling incoherently to himself.

[¶ 15] Soon, Thongsavanh left with Tao and Barajas, who dropped him off at Ramos's apartment. After fifteen minutes there, Ramos's boyfriend drove Thongsavanh home. Thongsavanh testified that he entered his apartment, took off his clothes, put them in the laundry, and went to sleep. When he awoke, his girlfriend was doing laundry. He shaved his head. His clothing from the night of the stabbing was never recovered, despite a complete search of Justin Asselin's apartment and Thongsavanh's apartment.

[¶ 16] A grand jury indicted Thongsavanh for both intentional or knowing murder, 17–A M.R.S.A. § 201(1)(A) (1983), and depraved indifference murder, 17–A M.R.S.A. § 201(1)(B). His first jury trial resulted in a murder conviction, which we vacated because the State had been allowed to introduce unfairly prejudicial evidence at trial. *See Thongsavanh*, 2004 ME 126, ¶¶ 8–10, 861 A.2d at 42.

[¶ 17] At the second trial, after Thongsavanh testified, counsel for Thongsavanh requested a jury instruction on manslaughter, which the court had delivered to the jury in the first trial. He argued that, given the confusion during the brawl on Main Street, it was possible that Thongsavanh took the knife from the vehicle and rushed into the crowd without any deliberate intent to kill anybody. He argued that there was no evidence of motive and that

Thongsavanh's own testimony did not preclude the jury from believing the testimony of others, or from finding that another knife was involved.

[¶ 18] The State argued that because McDuffee suffered five separate stab wounds, a manslaughter instruction was not generated.

[¶ 19] The court declined to give the jury instruction because it concluded that there was no rational basis for finding Thongsavanh guilty of manslaughter. The court reasoned that the evidence did not support Thongsavanh's theories of manslaughter. At the end of the trial, the jury found Thongsavanh guilty of murder.

[¶ 20] Thongsavanh moved for a new trial. First, he argued that 17–A M.R.S.A. § 201(1)(B), the depraved indifference murder statute, was unconstitutionally vague as applied in his case. Second, he argued (for the first time) that 17–A M.R.S.A. § 201(1–A) (Supp.2002) requires a criminally negligent manslaughter instruction every time that depraved indifference murder is charged. The court denied Thongsavanh's motion for a new trial.

[¶ 21] The court received sentencing memoranda and a presentence investigation report before sentencing Thongsavanh. The State argued for a basic sentence of fifty years and a final sentence of sixty years, taking into account the aggravating and mitigating factors. Thongsavanh argued that he should receive a sentence in the thirty-to-thirty-five-year range.

[¶ 22] In reaching its sentence, the court considered Thongsavanh's psychological evaluation; the pre-sentence investigation report, which included letters from people affected by the crime; and the sentencing memoranda submitted by the parties.[5]

---

5. Thongsavanh does not contest the evidentiary basis for any of the court's findings.

The court determined that the sentencing range for Thongsavanh was twenty-five years to life—roughly seventy years—and then set a basic sentence of forty-two years. The court reached this basic sentence because the killing was senseless:

[Thongsavanh] and [McDuffee] had never met. [Thongsavanh] had no reason to fear [McDuffee], to feel threatened by him, or even to dislike him. [McDuffee] had not insulted [Thongsavanh], had not teased him, had not belittled him, had not even made him the butt of any pranks. [McDuffee] had never taken a job from [Thongsavanh], never wooed away a girlfriend, never cut him off in traffic. All of the thoughtless things that we do daily that may cause someone's wrath to bubble over and erupt in violence, none of those happened here. [Thongsavanh] drove to a party, drank, heard that there was a fist fight down the street, and decided to go into that fist fight with a knife.

The court also considered the fact that McDuffee did not die at the scene of the crime and was aware, in his semi-conscious condition, that soon he would be dead.

[¶ 23] The court next reviewed mitigating factors—specifically, that Thongsavanh was young, lacked an adult criminal record, could be a good employee when he chose to be, and had "some capacity for human warmth and compassion." It then considered the aggravating factors, which it considered to be serious. The court found Thongsavanh had perjured himself at trial and refused to accept responsibility, show remorse, or demonstrate any empathy for McDuffee or his friends and family. The court also found the crime was part of a pattern of escalating behavior; Thongsavanh had repeatedly been involved in fights and criminal activity, had threatened family and friends, had failed

to maintain employment to support his two children, and had failed to establish a positive life outside of institutions. The court cited a counselor's evaluation that Thongsavanh gets a thrill out of fighting and feels no remorse or empathy afterward.

[¶ 24] The court also took into account that after entering prison for this crime, Thongsavanh attacked another inmate resulting in sixty stitches. He ended up in the high management section and was selected to be exchanged with an Arizona prisoner who is "one of the country's most notorious prisoners." Based on its analysis of the aggravating and mitigating factors, the court sentenced Thongsavanh to fifty-eight years. Thongsavanh now appeals from both his conviction and the sentence.

## II. DISCUSSION

### A. Appeal from Conviction

[¶ 25] Thongsavanh first argues that a trial court must give an instruction on the lesser-included offense of criminally negligent manslaughter *every time* the State charges depraved indifference murder. He further argues that, even if an instruction is not required every time the State charges depraved indifference murder, the evidence in this case generated the instruction because a jury rationally could have found him guilty of manslaughter. Finally, he argues that the depraved indifference murder statute is unconstitutionally vague and arbitrarily enforced as applied in his case. We consider each of his arguments in turn.

1. Must a Court Instruct the Jury on Criminally Negligent Manslaughter Every Time the State Charges De-

praved Indifference Murder? [6]

 [¶ 26] Thongsavanh argues that when the Legislature amended the murder statute to provide that "when the crime of depraved indifference murder is charged, the crime of criminally negligent manslaughter shall be deemed to be charged," 17–A M.R.S.A. § 201(1–A), it intended for manslaughter to be presented to the jury as a lesser-included offense every time a charge of depraved indifference murder was presented to a jury.

 [¶ 27] We review the interpretation of a statute de novo as a question of law. *Yeadon Fabric Domes, Inc. v. Me. Sports Complex, LLC,* 2006 ME 85, ¶ 13, 901 A.2d 200, 205. In interpreting a statute, "we seek to effectuate the intent of the Legislature, which is ordinarily gleaned from the plain language of the statute." *Irving Pulp & Paper, Ltd. v. State Tax Assessor,* 2005 ME 96, ¶ 8, 879 A.2d 15, 18 (quotation marks omitted). We consider the language in the context of the entire statutory scheme. *Id.* Only if the language of the statute is ambiguous will we examine the legislative history or other external indicia of legislative intent. *Id.*

[¶ 28] The statute at issue provides that every depraved indifference murder charge initially carries with it a charge of criminally negligent manslaughter:

§ 201. Murder

1. A person is guilty of murder if:

A. He intentionally or knowingly causes the death of another human being;

B. He engages in conduct which manifests a depraved indifference to the value of human life and which in fact causes the death of another human being; or

C. He intentionally or knowingly causes another human being to commit suicide by the use of force, duress or deception.

1–A. *For purposes of subsection 1, paragraph B, when the crime of depraved indifference murder is charged, the crime of criminally negligent manslaughter shall be deemed to be charged.*

17–A M.R.S.A. § 201 (emphasis added).[7]

[¶ 29] Thus, there can be no dispute that Thongsavanh entered the trial *charged* with criminally negligent manslaughter. The provisions of section 201(1–A) do not, however, speak to the operative question here: whether a jury considering a depraved indifference murder charge must always be *instructed* on manslaughter, without regard to the facts presented at trial. For the answer to that question, we look to other provisions of the Criminal Code.

[¶ 30] Since 1979, the Criminal Code has included a provision addressing the court's jury instructions on lesser-included offenses:

The court shall not instruct the jury to consider, nor shall the court as factfinder consider, a lesser included offense ... unless on the basis of the evidence there is a rational basis for finding the defendant guilty of that lesser included offense. If a rational basis exists, the

---

6. In this analysis, we do not address issues related to manslaughter that may have been committed "[r]ecklessly," 17–A M.R.S.A. § 203(1)(A) (Supp.2002), because the statute at issue, 17–A M.R.S.A. § 201(1–A) (Supp. 2002), deems only "criminally negligent manslaughter" to be charged when depraved indifference murder has been charged. On

appeal, Thongsavanh argues only that a *criminally negligent* manslaughter instruction should have been given pursuant to subsection (1–A).

7. Neither Thongsavanh nor the State brought the language of this statute to the trial court's attention during the instruction conference.

lesser included offense shall be considered by the factfinder if requested by either the State or defendant; otherwise, its consideration shall be a matter within the discretion of the court. 17–A M.R.S. § 13–A(1) (2006). The statute defines a "lesser included offense" to include "an offense carrying a lesser penalty which ... [i]s by statute expressly declared to be charged when the greater offense is charged." 17–A M.R.S. § 13–A(2)(C) (2006).

[¶ 31] This statute is unequivocal in requiring a review of the evidence before the determination is made as to what charges will, in fact, go to the jury. Through the language of section 13–A(1), the Legislature recognized that a crime that in some instances constitutes a lesser-included offense might not find rational support in the evidence produced during the trial of the initially charged offense. This provision demonstrates a legislative recognition that lesser-included offenses are distinct crimes for which an evidentiary basis must exist to generate a jury instruction. Section 13–A(1) has not been limited by the Legislature, and nothing in the enactment of 17–A M.R.S.A. § 201(1–A), automatically adding the criminally negligent manslaughter charge to the depraved indifference murder charge, indicates an intent on the part of the Legislature to limit the application of 17–A M.R.S. § 13–A(1) in such cases.[8]

[¶ 32] Accordingly, we conclude that, although criminally negligent manslaughter was deemed to have been *charged* when the State charged Thongsavanh with depraved indifference murder, *see* 17–A M.R.S.A. § 201(1–A), the court was required to instruct the jury on that lesser-

included offense only if, "on the basis of the evidence there [was] a rational basis for finding the defendant guilty of that lesser included offense," 17–A M.R.S. § 13–A(1).

## 2. Did the Evidence Produced at Trial Generate an Instruction on Manslaughter?

[¶ 33] The court concluded that the trial evidence could not rationally support a finding that Thongsavanh was guilty of manslaughter. Thongsavanh argues that the evidence did generate an instruction on manslaughter as a lesser-included offense. Because the Court is evenly divided on this issue, we affirm the trial court's jury instructions. *See Hale v. Antoniou,* 2003 ME 52, 820 A.2d 586.

## 3. Is the Depraved Indifference Murder Statute Unconstitutionally Vague as Applied?

█ [¶ 34] Thongsavanh contends that, because the Legislature repealed the comprehensive definition of depraved indifference formerly codified in section 201(1–A), and added the current subsection (1–A), which provides that criminally negligent manslaughter shall be deemed to be charged when depraved indifference murder is charged, the statute fails to give adequate notice of what conduct is criminal and could produce confusion in the jury.

[¶ 35] The State argues that this Court has already rejected vagueness challenges to the depraved indifference murder statute in similar circumstances. In addition, the State argues that this Court concluded similar language in the animal cruelty statute was not void for vagueness.

8. Although we do not examine extrinsic evidence of legislative intent because we do not find any ambiguity, it is worth noting that the Legislature stated, "criminally negligent man-

slaughter is automatically an alternative for the fact finder *if a rational basis exists for considering it."* L.D. 1335, Statement of Fact (112th Legis.1985) (emphasis added).

[¶ 36] The Due Process Clause of the United States Constitution requires that criminal defendants have fair notice that contemplated conduct is statutorily prohibited. *Colautti v. Franklin*, 439 U.S. 379, 390, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979); *State v. Weeks*, 2000 ME 171, ¶ 7, 761 A.2d 44, 46. A statute violates the Due Process Clause if it is so vague that it fails to provide sufficient definiteness that an ordinary person can understand what conduct is forbidden and encourages arbitrary and discriminatory enforcement. *Kolender v. Lawson*, 461 U.S. 352, 357, 103 S.Ct. 1855, 75 L.Ed.2d 903 (1983); *Weeks*, 2000 ME 171, ¶ 7, 761 A.2d at 46. We address a void for vagueness challenge by testing it in the circumstances of the individual case. *See State v. Witham*, 2005 ME 79, ¶ 11, 876 A.2d 40, 43.

[¶ 37] Through its 1985 amendment of subsection (1–A), the Legislature reverted to the common law definition of depraved indifference murder. *See* P.L.1985, ch. 416; L.D. 1335, Emergency Preamble & Statement of Fact (112th Legis.1985); *see also* P.L.1983, ch. 450, § 2 (enacting prior language defining depraved indifference). The statute provides for culpability when a person's conduct results in the death of another and, viewed objectively, manifests a depraved indifference to the value of human life. 17–A M.R.S.A. § 201(1)(B); *State v. Erskine*, 2006 ME 5, ¶¶ 18–19, 889 A.2d 312, 317–18; *State v. Reardon*, 486 A.2d 112, 119–20 (Me.1984); *State v. Woodbury*, 403 A.2d 1166, 1173 (Me.1979).

[¶ 38] The offense does not require evidence of a defendant's subjective state of mind. *Erskine*, 2006 ME 5, ¶ 18, 889 A.2d at 317–18. Rather, to be guilty of the offense, the defendant's conduct must be "so highly charged with death-producing potential that it merits punish-ment in equal degree with an intentional or knowing homicide." *Id.* ¶ 18, 889 A.2d at 318 (quotation marks omitted).[9] In describing the term "depraved indifference" in the context of Maine's animal cruelty statute, we elaborated that conduct manifesting depraved indifference is "morally debased, posing a high degree of risk, and manifesting a total lack of concern for . . . death or suffering." *Witham*, 2005 ME 79, ¶ 9, 876 A.2d at 42.

[¶ 39] Conduct manifests a depraved indifference to the value of human life when it is highly charged with death-inducing potential and demonstrates a total lack of concern that a person may die or suffer as a result of the conduct. *See Erskine*, 2006 ME 5, ¶ 18, 889 A.2d at 318; *Witham*, 2005 ME 79, ¶ 9, 876 A.2d at 42. Applying these legal principles, fact-finders have found, or could rationally have found, depraved indifference when a defendant gave the victim a bloody nose, held a hand over her mouth until she stopped yelling, and hit her in the head with a hammer, *Erskine*, 2006 ME 5, ¶ 11, 889 A.2d at 316; when a defendant shot the victim "during a drunken approximation of Russian roulette," *State v. Boyce*, 1998 ME 219, ¶¶ 1, 2, 718 A.2d 1097, 1098; when a child in his father's care died of a massive abdominal infection resulting from an intestinal rupture due to trauma that may have happened two days earlier, *State v. Ardolino*, 1997 ME 141, ¶¶ 2, 21, 697 A.2d 73, 75–76, 80; when a defendant intentionally started a fire in a building, resulting in four deaths, *State v. Smith*, 675 A.2d 93, 95–96 (Me.1996); when a defendant forced the victim into her car, may have pushed her out while he was operating at sixty miles-per-hour, and ran her over as she sat in the street, *State v. Cumming*, 634 A.2d

---

9. If convicted of depraved indifference murder, a person will receive a sentence of twenty-five years to life. 17–A M.R.S. § 1251 (2006).

953, 955, 957 (Me.1993); when a defendant, after the victim said he did not care whether he lived or died, tried to give the victim a gun, rolled the cylinder as if playing Russian roulette, then raised the gun to the victim's head and fired, *State v. Tanguay*, 574 A.2d 1359, 1360–61 (Me.1990); when a defendant fired two shots into a building from fifty feet away knowing there were two adults and five children inside, *State v. Michaud*, 513 A.2d 842, 846, 854 (Me.1986); when a defendant set a targeted fire in a building, *State v. Joy*, 452 A.2d 408, 412 (Me.1982); and when a defendant swung a child by his heels into a wall and failed to provide the child adequate nourishment, *State v. Crocker*, 435 A.2d 58, 62, 67 (Me.1981).

[¶ 40] As with the facts present in these earlier cases, the conduct to which the witnesses testified at Thongsavanh's trial can be judged by the standard of the depraved indifference murder statute. That the Legislature adopted Maine's common law definition of depraved indifference murder does not render the statute vague and unenforceable. *See id.* at 63–64. Further, the statute is not vague simply because we have been called upon to exercise our function of interpreting its plain meaning. *See id.* at 63–68 (concluding depraved indifference murder statute was not void for vagueness as being indistinct from criminally negligent manslaughter); *Witham*, 2005 ME 79, 876 A.2d 40 (rejecting vagueness challenge to animal welfare statute prohibiting a person from causing pain, death, or torture to an animal in a manner that manifests depraved indifference to the animal's life or suffering). The depraved indifference murder statute is not unclear or vague in any way that would render its application in the present case unconstitutional.

### B. Appeal from Sentence

[¶ 41] The Legislature has provided that a person convicted of murder "shall be sentenced to imprisonment for life or for any term of years that is not less than 25." 17–A M.R.S. § 1251 (2006). The court sentenced Thongsavanh to fifty-eight years for the murder of Morgan McDuffee. We accepted Thongsavanh's sentence appeal to review this sentence. *See State v. Thongsavanh*, No. SRP–06–35 (Mar. 20, 2006).

[¶ 42] Thongsavanh argues that the court set his basic sentence too high because the murder was not among the most egregious imaginable and falls in the low-to-medium range of seriousness. He argues that he was not involved in the instigation of the fight, did not plan or intend to be there, and was spontaneously involved in a momentary street brawl. In addition, he contends that the maximum sentence was set too high in comparison to other sentences for more severe murders.

[¶ 43] The current statutory framework for sentencing, 17–A M.R.S. § 1252–C (2006), is a codification of our description of the sentencing process in *State v. Hewey*, 622 A.2d 1151, 1154–55 (Me.1993). The statute provides:

In imposing a sentencing alternative pursuant to section 1152 that includes a term of imprisonment relative to murder, a Class A, Class B or Class C crime, in setting the appropriate length of that term as well as any unsuspended portion of that term accompanied by a period of probation, the court shall employ the following 3–step process:

1. The court shall first determine a basic term of imprisonment by considering the particular nature and seriousness of the offense as committed by the offender.

2. The court shall next determine the maximum period of imprisonment to be imposed by considering all other relevant sentencing factors, both aggrava-

ting and mitigating, appropriate to that case. These sentencing factors include, but are not limited to, the character of the offender and the offender's criminal history, the effect of the offense on the victim and the protection of the public interest.

3. The court shall finally determine what portion, if any, of the maximum period of imprisonment should be suspended and, if a suspension order is to be entered, determine the appropriate period of probation to accompany that suspension.

17–A M.R.S. § 1252–C. We review the determination of the basic sentence for misapplication of principle and the determination of the maximum sentence for abuse of discretion. *State v. Sweet*, 2000 ME 14, ¶¶ 14–15, 745 A.2d 368, 372–73.

[¶ 44] Here, the court set the basic sentence based on the senselessness and unprovoked violence of the crime, and the fact that McDuffee did not die at the scene of the crime and was aware of his impending death. Given these facts, it was not a misapplication of principle for the court to set a basic sentence of forty-two years.

[¶ 45] The court set the maximum sentence at fifty-eight years after taking into account first, the mitigating factors of Thongsavanh's youth, lack of an adult criminal record, and capacity for some human warmth and compassion; and, second, the serious aggravating factors of Thongsavanh's refusal to accept responsibility or show any empathy or remorse, his perjury, his pattern of escalating behavior, his thrill-seeking through violence, his defiance, his willfully untreated substance abuse and anger problems, his violence at the Youth Center and in prison, and psychological evaluations that indicate a lack of social conscience. Given the seriousness and breadth of the aggravating factors as compared to the mitigating factors, the court did not abuse its discretion in setting the maximum sentence at fifty-eight years.

The entry is:

Judgment of conviction and sentence affirmed.